IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NOS. B0391IM1503861-0104 and B0391IM1503861-016, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | |
| WFG INVESTMENTS, INC., WFG ADVISORS, LP, and WFG STRATEGIC ALLIANCE, INC., | ) ) ) | *Jury Trial Demanded* |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs, Certain Underwriters at Lloyd's of London Subscribing to Policy Numbers B0391IM1503861-014 and B0391IM1503861-016 ("Underwriters"), and for their Complaint for Declaratory Judgment, state as follows:

## PARTIES

1.     Underwriters are Lloyd's Syndicates authorized to underwrite and insure risks within the Lloyd's of London insurance market, and have their principal places of business outside the United States.  None of Underwriters' members are domiciled in the State of Texas. At all times relevant herein, Underwriters were authorized to issue policies of insurance in the State of Texas and issued certain policies to WFG Investments, Inc., WFG Advisors, LP, and WFG Strategic Alliance, Inc. (collectively, "WFG"), as detailed herein.

2.     WFG Investments, Inc. is a corporation organized under the laws of Texas with its principal place of business located in Dallas, Texas.

3.      WFG Advisors, LP is a domestic limited partnership organized under the laws of Texas with its principal place of business located in Dallas, Texas, and on information and belief all of the partners are citizens of the State of Texas.

4.      WFG Strategic Alliance, Inc. is a corporation organized under the laws of Texas with its principal place of business located in Dallas, Texas.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 28 U.S.C. §§ 2201 and 2202, as Underwriters seek a declaration of the parties' rights and obligations under the Policies issued by Underwriters.

6.      Jurisdiction is conferred by 28 U.S.C. § 1332(a), as complete diversity exists between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as on information and belief all defendants reside within the State of Texas, and a substantial part of the events or omissions giving rise to this action occurred within this District.

## UNDERWRITERS' INSURANCE POLICIES

8.      Underwriters issued a Securities Shield Securities Broker-Dealer Professional Liability Policy, Policy No. B0391IM1503861-014 (the "Primary Policy"), to WFG for the **Policy Period**[1] of November 30, 2015 to November 30, 2016, extended by endorsement to November 30, 2017.   Subject to its terms, conditions, and limitations, the Primary Policy provides a per **Claim** Limit of Liability of $2,000,000 and an overall aggregate Limit of Liability of $4,000,000.

---

[1] Terms in bold are defined in the Primary Policy.

9.    Under Insuring Agreement A., cited below, the Primary Policy is subject to a $75,000 per **Claim** retention.  The Limit of Liability shall be reduced and may be exhausted by amounts incurred as **Defense Costs**, and **Defense Costs** shall be applied to the retention.

10.    Underwriters issued a Securities Shield Securities Broker-Dealer Excess Professional Liability Policy, Policy No. B0391IM1503861-016 (the "Excess Policy"), to WFG for the **Policy Period** of November 30, 2015 to November 30, 2016, extended by endorsement to November 30, 2017.

11.    The Excess Policy provides a per Claim Limit of Liability of $2,000,000 and an overall aggregate Limit of Liability of $4,000,000 and includes a single Insuring Clause, subject to the applicable Limits of Liability and retentions set forth in Items C and F of the Excess Policy's Declarations Page, among other terms, provisions, conditions and limitations.

12.    Except as specifically set forth in the Excess Policy, coverage under the Excess Policy conforms with all provisions of the Primary Policy.

13.    Section 1. of the Primary Policy defines the scope of coverage afforded by the Policies for WFG under Insuring Agreement A., as follows:

> **A.    BROKER/DEALER         PROFESSIONAL         LIABILITY INSURANCE (INCLUDING FAILURE TO SUPERVISE)**
>
> This policy shall pay on behalf of the **Broker/Dealer Loss** arising from a **Claim** first made against the **Broker/Dealer** during the **Policy Period** or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Broker/Dealer**:
>
> 1.    in the rendering or failure to render **Professional Services** by the **Broker/Dealer**; or
>
> 2.    in **Failing to Supervise** a **Registered Representative** in the rendering or failure to render **Professional Services** by such **Registered Representative** on the behalf of the **Broker/Dealer**

3.      in **Failing to Supervise** a **Registered Representative** in connection with **Selling Away** by such **Registered Representative**.

14.      Section 3. of the Primary Policy contains the following definitions, in pertinent parts:

(d)      **"Claim"** means the following brought by an **Insured's** customer or client in such capacity:

(1)      a written demand for monetary relief; or

(2)      a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(i)      service of a complaint or similar pleading; or

(ii)      receipt or filing of an arbitration demand or statement of claim.

\*      \*      \*

(t)      "**Wrongful Act**" means any negligent act, error or omission by the **Broker/Dealer**, any director, officer, partner or employee thereof, or by any **Registered Representative** thereof and solely in their respective capacities as such.

\*      \*      \*

(h)      **"Interrelated Wrongful Act(s)"** means **Wrongful Acts** which are the same, related or continuous, or **Wrongful Acts** which arise from the same, related or common nexus of facts regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action:

1.      **Claims** in connection with securities of any entity (or affiliated entities) which become(s) the subject of any bankruptcy, insolvency, receivership, liquidation or reorganization proceeding; or

2.      **Claims** in connection with securities purchased in connection with an offering (or series of offerings) of securities issued by the same entity or affiliated entities; or

3.      Multiple **Selling Away Claims** alleging the sale, attempted sale, or servicing of any of the same unapproved products.

15.    Section 6.D. of the Primary Policy provides:

D.      More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts**, regardless of the causes of action plead or the number or identity of claimants involved, shall be deemed to constitute a single **Claim**, and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

1.      the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

2.      the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to subsection 8(c) below.

16.    Section 5. of the Primary Policy provides the following exclusion:

The Insurer shall not be liable for **Loss** in connection with any **Claim** made against an **Insured**:

\*         \*         \*

e)      alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the inception date of the first Securities Broker/Dealer Errors And Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the **Broker/Dealer** designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim**, or alleging, arising out of, based upon or attributable to any subsequent **Interrelated Wrongful Act**;

\*         \*         \*

17.    New York law governs the disposition of this case.  Section 22 of the Primary

Policy provides in relevant part that "[t]his insurance shall be governed by and construed in

accordance with the law of the state designated in Item 11 of the Declarations." Item 11 of the

Declarations designates the Choice of Law governing the Policies as New York.

 18. Section I. of the Excess Policy defines the scope of coverage afforded to WFG as

follows:

> **I. INSURING CLAUSE**
>
> This Policy provides the Broker/ Dealer with insurance in excess
> of the Underlying Policies, and conforms with the Underlying
> Policies except as regards: (a) the premium; and (b) the amount
> and Limit of Liability; and (c) the subject matter of Clauses II, III,
> IV, V, VI, and VII; and as otherwise may be provided herein. This
> Policy is subject to the same insuring clauses, definitions, terms,
> conditions, exclusions, and other provisions as those set forth in
> the Underlying Policies as described in the materials submitted to
> Insurer(s) in connection with the Application for this Policy. No
> changes to the Underlying Policies as so described shall be binding
> upon Insurer(s) under this Policy unless specifically agreed in
> writing by Insurer(s) hereon. This Policy shall not provide
> coverage broader than that provided by the Underlying Policies
> unless the Insurer(s) specifically agrees to grant such broader
> coverage herein or by written endorsement attached to this Policy.

## THE CALDWELL DEMAND LETTER AND STATEMENT OF CLAIM

 19. On October 27, 2016, WFG provided Underwriters with a copy of a demand letter

sent to WFG from the McCathern law firm in Dallas on behalf of Charlie and Jeanie Caldwell

dated October 18, 2016 (the "Caldwell Demand Letter").

 20. The letter demanded $3,800,000 from WFG based on allegations of unsuitable

investment advice, unauthorized trading, and inadequate supervision with respect to a WFG

registered representatives, Jay D. Jordan ("Jordan"), and threatened to initiate a FINRA

arbitration based on those allegations.

 21. The Caldwell Demand Letter asserts that the Caldwells were older individuals

who had limited investment experience prior to opening investment accounts with WFG in June

2008 and October 2012.  The Caldwells alleged that Jordan, a WFG representative, failed to exercise due diligence when they sold the Caldwells investment products which were unsuitable for their investor profile.  The resulting portfolio allegedly "was leveraged and over concentrated in equities and the equity holdings included long and short ETFs," which allegedly resulted in significant losses to the Caldwells' accounts.

22.     On or about February 12, 2017, WFG provided Underwriters with a copy of a FINRA Statement of Claim filed against WFG on February 7, 2017, brought as a follow-on to the Caldwell Demand Letter (the "Caldwell Statement of Claim").

23.     The Caldwell Statement of Claim is brought by the Caldwells and the six other customers of Jordan who subsequently joined the Caldwells' case.  While Jordan is not named as a defendant in the Caldwell Statement of Claim, he is included as a non-party based on his capacity as a "registered representative" with WFG.

24.     The Caldwell Statement of Claim alleges that Jordan recommended and traded highly risky, unsuitable investments for claimants' accounts, and that WFG failed to reasonably supervise Jordan to detect and prevent unauthorized trading.  Based on the alleged misconduct of WFG and Jordan, the Caldwell Statement of Claim asserts causes of action against WFG for Suitability, Failure to Supervise, and Respondeat Superior, and seeks $4 million in actual compensatory damages.

### BURKE AND BANNISTER STATEMENTS OF CLAIM

25.     On or about March 7, 2017, WFG provided Underwriters with copies of two additional FINRA Statements of Claim brought by investors against WFG based on the alleged misconduct of WFG and Jordan---an action filed against WFG by Ronald Burke on or about

February 28, 2017 (the "Burke Statement of Claim"), and by Frank Bannister (and affiliated trusts and family members) on or about March 2, 2017 (the "Bannister Statement of Claim").

26.     As with the Caldwell Statement of Claim, the Burke and Bannister Statements of Claim both include Jordan as a non-party based on his capacity as a registered representative with WFG.

27.     Both Statements of Claim allege – as with the Caldwell Statement of Claim – that Jordan recommended and traded highly risky, unsuitable investments for claimants' accounts, and that WFG failed to reasonably supervise Jordan to detect and prevent unauthorized trading. Based on the alleged misconduct of WFG and Jordan, both the Burke and Bannister Statements of Claim assert causes of action against WFG for Violation of Oklahoma Securities Laws, Common Law Fraud, Negligence (Gross Negligence), and Failure to Supervise.

## GRAVES DEMAND AND STATEMENT OF CLAIM

28.     On July 31, 2015, an e-mail was sent by attorney Ronald Ripley on behalf of Graves to Jordan, WFG's registered representative (the "Graves Demand").  The e-mail was also copied to Claude Connelly, Chief Operating Officer of WFG.

29.     The Graves Demand identifies Graves' WFG brokerage account and asserts that "[d]irectly as a result of the negligent failures of you and others at WFG, unauthorized and improper losses were realized in this account on or after June 30, 2011."  In the Graves Demand, Mr. Ripley reiterates his client's request (referring to purported prior repeated requests) asking how Jordan or WFG intend to "restore the June 30, 2011 account balance of $262,153.40."  Mr. Ripley further demanded a written response by August 3, 2015, to include a proposal as to how Graves' brokerage account would be restored, and stated that if such a proposal was not

received, he would "commence appropriate legal action to recover of [sic] the lost funds and such other relief as is legally available."

30.     On or about April 20, 2016, Graves filed a FINRA Statement of Claim, styled *Ben L. Graves, as Trustee of the Ben L. Graves Trust v. WFG Investments, Inc.*   The Graves Statement of Claim asserts the same allegations as those first stated in the Graves Demand of July 31, 2015.

31.     In the Graves Statement of Claim, Graves alleges that Jordan engaged in unauthorized trading which resulted in substantial losses to Graves' account.   The Graves Statement of Claim asserts causes of action against WFG for Violation of Oklahoma Securities Laws, Common Law Fraud, Breach of Fiduciary Duty, Negligence (Gross Negligence), and Failure to Supervise.   The Graves Statement of Claim alleges that Graves sustained losses of $152,517 in his WFG brokerage account and seeks compensatory damages in the amount of $90,000, plus punitive damages, interest, and attorneys' fees.

32.     WFG provided first notice of the Graves Demand and the Graves Statement of Claim to Underwriters on March 8, 2017.

33.     WFG did not provide notice to Underwriters of the dispute between WFG and Graves prior to March 8, 2017.

## THE JANUARY 29, 2017 LIST OF INVESTORS AND THE SCHNEITER LETTER

34.     On January 29, 2017, WFG provided Underwriters with a list of investors, and suggested that additional complaints had been filed against WFG based on the alleged misconduct of WFG and Jordan.   The list included the names of six investors in addition to the Caldwells represented by the McCathern law firm; the names of nine investors which WFG

advised are represented by attorney Jonathan Kurta of New York; and the names of several additional investors who, on information and belief, may have claims against WFG and Jordan.

35.     On March 8, 2017, WFG provided Underwriters with a copy of a letter sent to WFG from the Schulte, Schneiter & Gibson law firm on behalf of Lawrence E. Schneiter III and Marsha W. Schneiter dated July 5, 2016 (the "Schneiter Letter").

36.     The Schneiter Letter asserted allegations of unsuitable investment advice, unauthorized trading, and inadequate supervision with respect to WFG's registered representative, Jordan, and threatened to initiate a formal FINRA action based on those allegations.

37.     The Schneiter Letter asserted that the Schneiters were older individuals who had opened investments accounts with WFG broker Jay Jordan.  The Schneiters alleged that within the past year and without consulting the Schneiters, Jordan elected to move nearly all of the Schneiders' investments into a triple leveraged natural gas exchange trade fund ("ETF").  The Schneiters' attorney alleged in the Schneiter Letter that the trade was "clearly unauthorized as well as unbelievably inappropriate," and that the attorney "suspect[ed] that the Schneiters are not the only customers that Mr. Jordan placed in ETFs that were clearly unsuitable for their investment needs."

38.     Noting that "another complaint was raised in July 2015 seeking $164,644.83 in damages for unauthorized trading," the Schneiters alleged a clear failure by WFG to supervise Jordan.

## INSURANCE COVERAGE DISPUTE

39.     WFG seeks insurance coverage from Underwriters under the Policies in connection with the above-referenced matters.

40.     Underwriters dispute that coverage exists for those matters under the Primary Policy and the Excess Policy.

41.     An actual, present, and bona fide controversy exists between Underwriters and WFG with respect to whether there is insurance coverage for the above-referenced matters under the Primary Policy and the Excess Policy.

42.     A judicial declaration is necessary to establish the parties' rights and duties, if any, under the Primary Policy and the Excess Policy.

## COUNT I – DECLARATORY JUDGMENT
**(Rescission)**

43.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 42 as though set forth fully herein.

44.     On November 17, 2015, WFG submitted an "Aspen Specialty Insurance Company Financial Services Professional Liability Renewal Application" (the "Application") to Underwriters.  The Application was signed by Fred Knopf as General Counsel for WFG.

45.     The Preamble to the Primary Policy's Insuring Agreements provides that:

> "In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the application attached hereto and made a part hereof, and its attachments and the material incorporated therein, and subject to the Limit of Liability and all other terms and conditions contained herein, Underwriters at Lloyd's, hereinafter called the 'Insurer', agrees as follows:"

46.     In response to Question 34 on the Application, which asked "Do the Applicants, their directors, officers, employees, **Registered Representatives**, have knowledge or information of any fact, circumstance, or wrongful act which may reasonably give rise to a claim being made against them," WFG answered "No."

47.     In response to Question 35, which asked WFG to "Please describe the method by which the Applicant polls its **Registered Representatives** in order to respond to question 34," WFG answered:

> "This is a question reviewed during our branch examinations and it is information requested as part of the annual registration and CE obligations of the registered representatives.   We also monitor for any potential complaints via our surveillance system that includes review of activities and correspondence, including email surveillance."

48.     The "Warranty" section of the Application provides in relevant part that:

> "The undersigned warrants that the information contained herein is true as of the date this Application is executed and understands that it shall be the basis of this Policy of insurance and deemed incorporated herein if the Insurer accepts this Application by issuance of a Policy. It is understood and agreed that this warranty constitutes a continuing obligation to report to the Insurer, as soon as possible, any material change in the circumstances of the Applicants' business."

49.     WFG omitted from its Application, and subsequently failed to disclose to Underwriters until March 8, 2017, material facts concerning the Graves Demand, a copy of which Claude Connelly, WFG's Chief Operating Officer, received on July 31, 2015.

50.     Had Underwriters known about the Graves Demand prior to issuing the Policies, they would not have issued either the Primary or Excess Policy to WFG under the same coverages, terms, conditions, exclusions, limits of liability, retentions, and the premium that they charged.

51.     WFG's response to Question 34 on the Application was false, misleading, incomplete, and/or inaccurate.

52.     WFG's misrepresentations regarding the Graves Demand were material to Underwriters' evaluation of the risk WFG presented in the Application.

53.     Underwriters' decision to accept the risk and issue a policy with the coverages, terms, conditions, exclusions, limits of liability, and amount of the retentions contained therein, and to charge the premium that they charged, was dependent upon Underwriters receiving a complete and accurate answer to Question 34 on the Application, which WFG failed to provide.

54.     WFG's failure to disclose material information in its Application in its answer to Question 34 also constituted a breach of its obligations under the Policies' terms and the Application.

55.     WFG's non-disclosure, concealment, and/or misrepresentation of material facts which formed the basis of the contracts of insurance render the Primary Policy and the Excess Policy null and void.

56.     By reason of WFG's omissions and concealments in the Application and its aforesaid breaches of the Primary Policy, Underwriters' Primary Policy and Excess Policy are null and void from inception, and the Primary Policy and the Excess Policy should be adjudicated rescinded.

57.     Underwriters will timely return any premiums charged to WFG for the Primary Policy and the Excess Policy should they be adjudicated rescinded by this Court.

### COUNT II – DECLARATORY JUDGMENT
### (Scope of Coverage -- Claim Was Not First Made During The Policy Period)

58.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 57 as though set forth fully herein.

59.     The Primary Policy and Excess Policy are claims-made and reported policies, requiring that a **Claim** be first made against the **Broker/Dealer** during the **Policy Period** in order to trigger coverage under the Policies.

60.     In the alternative, and without prejudice to Count I above, Underwriters assert that the Caldwell Demand Letter, the Caldwell Statement of Claim, the Burke Statement of Claim, the Bannister Statement of Claim, the Graves Demand, the Graves Statement of Claim, the Schneiter Letter, and any complaints referenced against WFG in the January 29, 2017 investor list, constitute **Interrelated Wrongful Acts,** pursuant to Section 3.(h) of the Primary Policy.

61.     Therefore, pursuant to Section 6.D. of the Primary Policy, the Caldwell Demand Letter, the Caldwell Statement of Claim, the Burke Statement of Claim, the Bannister Statement of Claim, the Graves Demand, the Graves Statement of Claim, the Schneiter Letter, and any complaints referenced against WFG in the January 29, 2017 investor list must be treated as a single **Claim** made at the time which the earliest **Claim** involving the same **Interrelated Wrongful Act** was first made---i.e., July 31, 2015, when the Graves Demand was first made prior to the **Policy Period** of the Primary Policy and Excess Policy.

62.     Accordingly, Underwriters have no duty to defend of indemnify WFG in connection with the single **Claim** under either the Primary Policy or the Excess Policy, as the **Claim** was first made against WFG on July 31, 2015, prior to the **Policy Period**.

### COUNT III – DECLARATORY JUDGMENT
### (Prior Knowledge -- Exclusion 5.e))

63.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 62 as though set forth fully herein.

64.     Exclusion 5.e). of the Primary Policy bars coverage in connection with any **Claim** made against an **Insured**:

    e)      alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the inception date of the first Securities Broker/Dealer Errors And Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the **Broker/Dealer** designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the

14

inception date of this policy, if on or before such date any **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim**, or alleging, arising out of, based upon or attributable to any subsequent **Interrelated Wrongful Act**;

65.     In the alternative, and without prejudice to Counts I and II above, Underwriters contend that the allegations in the Caldwell Demand Letter, the Caldwell Statement of Claim, the Burke Statement of Claim, the Bannister Statement of Claim, the Graves Demand, the Graves Statement of Claim, the Schneiter Letter, and any complaints referenced against WFG in the January 29, 2017 investor list are precluded from coverage under Exclusion 5.e), as the matters allege, arise out of, are based upon, or are attributable to **Wrongful Acts** which occurred prior to November 30, 2015, the inception date of the first Policy issued to WFG.

66.     WFG knew, or could have reasonably have foreseen, prior to the November 30, 2015 inception date of the Primary Policy that the **Wrongful Acts** could lead to a **Claim,** or alleging, arising out of, based upon or attributable to any subsequent **Interrelated Wrongful Act**.

WHEREFORE, Plaintiff, Certain Underwriters at Lloyd's of London Subscribing to Policy Numbers B0391IM1503861-014 and B0391IM1503861-016, pray that this Court enter a judgment in its favor and against WFG Investments, Inc., WFG Advisors, LP, and WFG Strategic Alliance, Inc. as follows:

1.     Declaring that Policy Numbers B0391IM1503861-014 and B0391IM1503861-016 null and void *ab initio*, and rescinded; and/or

2.     Declaring that Underwriters have no duty to defend or indemnify WFG in connection with the Caldwell Demand Letter, the Caldwell Statement of Claim, the Burke Statement of Claim, the Bannister Statement of Claim, the Graves Demand, the Graves Statement of Claim, any complaints referenced against WFG in the January 29, 2017 investor list, or the Schneiter Letter.

**<u>JURY DEMAND</u>**

15

Underwriters demand a jury trial.


DATED:        March 17, 2017                    Certain Underwriters at Lloyd's of London
                                                Subscribing to Policy Numbers
                                                B0391IM1503861-014 and
                                                B0391IM1503861-016



                            TOLLEFSON BRADLEY MITCHELL & MELENDI, LLP

                             /s/ *John C. Tollefson*
                            John C. Tollefson
                            State Bar No. 20109400
                            Southern District Bar No. 13149
                            JohnT@tbmmlaw.com
                            Stephen A. Melendi
                            State Bar No. 24041468
                            Southern District Bar No. 38607
                            StephenM@tbmmlaw.com
                            2811 McKinney Avenue, Suite 250 West
                            Dallas, Texas  75204
                            Telephone:     (214) 665-0100
                            Facsimile:     (214) 665-0199

                            David L. Koury
                            R. Nathan Randall
                            Adrian T. Rohrer
                            BATESCAREY LLP
                            191 North Wacker, Suite 2400
                            Chicago, Illinois 60606
                            Ph.:    (312) 762-3100
                            Fax:    (312) 762-3200


1717843.2